## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ALEXANDRA TORIBIO, individually and on behalf of all others similarly situated,<br><br>                     Plaintiff,<br><br>v.<br><br>THE KRAFT HEINZ COMPANY,<br><br>                     Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Alexandra Toribio ("Plaintiff") brings this Class Action Complaint against Defendant the Kraft Heinz Company (collectively, "Defendant" or "Kraft"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## NATURE OF THE ACTION

1.      Plaintiff brings this important consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Capri Sun® Strawberry Kiwi juice drink (the "Product"[1]), which is a prominently labeled as containing "All Natural Ingredients." In reality, Plaintiff's testing has revealed that the Product contains per- and polyfluoralkyl substances ("PFAS"), a category of synthetic chemicals that are, by definition, not "natural."

---

[1] As alleged herein, Defendant conceals the presence of PFAS in the Product. Accordingly, discovery will reveal the exhaustive list of substantially similar products that are included in this action.

2.     PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[2]

3.     In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[3]

4.     Defendant formulates, manufactures, markets, and sells the Product, which they uniformly represent as a drink made from "All Natural Ingredients," that has "less sugar than regular juice drinks," and is free from artificial colors, corn syrup, and other ingredients which might be concerning to health-conscious consumers.[4]

---

[2] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," Environ. Sci. Technol. 2022, 56, 1162-1173, 1162.

[3] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-healthrisks-underestimated/ (Last Accessed November 18, 2022)

[4] Pictures available on authorized retailer Target's website, https://www.target.com/p/capri-sun-strawberry-kiwi-pack-10pk-6-fl-oz-pouches/-/A-15066920#lnk=sametab (Last Accessed November 18, 2022)





5.     Defendant has engaged in tireless marketing efforts convince consumers that Capri Sun beverages are a healthy choice for kids that are "always made with all natural ingredients."[5]

6.     As the producer of some of the most widely recognized brands in the world, Kraft knows the importance of marketing and labeling, including the value of the label representations they carefully choose for placement on the Product.

7.     Defendant's uniform marketing is intentionally designed to drive sales and increase profits by targeting health-conscious consumers—and specifically, conscientious parents and caregivers-- who reasonably believe that the Product is free from ingredients which are artificial or otherwise unnatural.

8.     However, despite Defendant's consistent and pervasive marketing representations to consumers that their Product is a healthy, all-natural juice drink, Plaintiff's independent testing has determined that the Product actually contains PFAS—a category of man-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns.

9.     The presence of PFAS is entirely inconsistent with Defendant's uniform representations that Capri Sun kids' drinks, including the Product, "are proudly made with all natural ingredients."[6]

10.     As a result of Defendant's misconduct, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

11.     Accordingly, Plaintiff brings her claims against Defendant individually and on behalf of a Class of all other similarly situated for (1) violation of New York Gen. Bus. Law § 349,

---

[5] https://www.caprisun.com/parents/juice-drinks (Last Accessed November 18, 2022)
[6] https://www.caprisun.com/ (Last Accessed November 18, 2022)

*et seq.*; (2) violation of New York Gen. Bus. Law § 350, *et seq.*; (3) breach of express warranty; (4) fraud; (5) constructive fraud; and (6) unjust enrichment.

## PARTIES

### A. Plaintiff

12.     Plaintiff Alexandra Toribio is a resident of Queens, New York, and was, at all times relevant hereto, a citizen of New York.

### B. Defendant

13.     Defendant The Kraft Heinz Company is a multi-national food and beverage company and the producer of numerous consumer brands, including Capri Sun. Kraft's corporate headquarters is located in Chicago, Illinois.

## JURISDCTION AND VENUE

14.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over Defendant because is headquartered in this District, Defendant has substantial aggregate contacts with this District, including engaging in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of Illinois.

16.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, Defendant transacts business in this District, and Defendant has intentionally availed themselves of the laws and markets within this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

17.     The U.S. market for children's juice boxes is worth more than $1.5 billion.[7] In an already crowded market, there is enormous incentive for companies to cultivate a wellness-minded corporate image and market their products as safe and natural.

18.     There is no question that children are the target market for the Product. In fact, Defendant markets Capri Sun as the "#1 Kids' Favorite Juice Drink."[8]

19.     In recent years, Defendant has tailored the marketing of the Product to appeal to health-conscious parents and caregivers by highlighting the fact that it contains "All Natural Ingredients" and less sugar than competing juice products.

20.     Defendant sells Capri Sun juice products, which include the Product that is the subject of this litigation, at mass market retailers, grocery stores, and online retailers throughout the United States, including Target, Walmart, and Amazon.

### *Defendant's False and Deceptive Advertising*

21.     The Product is a ready-to-drink kids' juice beverage which is uniformly represented as being made with "All Natural Ingredients" and free from synthetic or artificial ingredients (the "All Natural Representations").

---

[7] https://www.fooddive.com/news/sugar-concerns-box-out-kids-juice-market/561221/ (Last Accessed November 18, 2022)

[8] https://www.caprisun.com (Last Accessed November 18, 2022)

22.     The Product's packaging is replete with representations designed to convince consumers that it is a healthy choice, beginning with the Product's logo, which appears without fail on the Product's front label, and includes the conspicuous phrase "All Natural Ingredients." Defendant intentionally joins this phrase to the Capri Sun brand name in order to convince reasonable consumers that its products are free from any synthetic chemical ingredients.



23.     Defendant does not disclose the presence of PFAS—or any other synthetic chemical—in the Product's ingredients. Rather, Defendant further bolsters its "all natural" claims with a short and sweet ingredient list[9]:

INGREDIENTS: FILTERED WATER, SUGAR, PEAR AND STRAWBERRY JUICE CONCENTRATES, MONK FRUIT CONCENTRATE, CITRIC ACID, APPLE JUICE CONCENTRATE, NATURAL FLAVOR, MUSHROOM EXTRACT (TO PROTECT QUALITY).

---

[9] Pictures available on authorized retailer Target's website, https://www.target.com/p/capri-sun-strawberry-kiwi-pack-10pk-6-fl-oz-pouches/-/A-15066920#lnk=sametab (Last Accessed November 18, 2022)

24.     The Product touts "Filtered Water" as its first ingredient, leading reasonable consumers to believe that additional care has been taken to remove any incidental chemicals or impurities that might otherwise contradict their "all natural" claims.

25.     The All Natural Representations are carried through to Defendant's website which reassures parents and caregivers that the Product is a healthy choice for families[10]:



**WHAT MAKES CAPRI SUN® INGREDIENTS ALL NATURAL?**

Every ingredient in Capri Sun® is All Natural. Capri Sun® ingredients contain no artifical colors, flavors, or preservatives.

26.     Further, when consumers visit the Capri Sun website, they are immediately confronted with the following representation on the home page:



**CAPRI SUN® KIDS' DRINKS ARE ALWAYS MADE WITH ALL NATURAL INGREDIENTS**

---

[10] https://www.caprisun.com/faq (Last Accessed November 18, 2022)

27.     Defendant is unequivocal in its representations: "**Every** ingredient in Capri Sun®
is All Natural" and "Capri Sun® Kids' Drinks are **always** made with all natural ingredients."
(emphasis added)

28.     Thus, it is undisputable that the Product is uniformly represented across all
marketing channels-- including the Product's front label, where it cannot be missed by consumers
-- as a kids' juice beverage containing only natural ingredients.

***PFAS Chemicals and Associated Risks***

29.     PFAS are a category of highly persistent and potentially harmful <u>man-made
chemicals</u>.[11]

30.     PFAS are <u>not naturally occurring</u>.[12] They were first developed by scientists in the
1940s.[13] Thus, they are indisputably "artificial" and not "natural."

31.     The man-made PFAS chemicals, which are in the Product, are sometimes called
"forever chemicals" because they bioaccumulate, or build up in the body over time.

32.     Diet is considered a major route of PFAS exposure for humans, and reasonable
consumers purchasing Product represented as natural would not expect them to contain harmful
man-made chemicals, such as PFAS.[14]

---

[11] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (Last Accessed November
18, 2022)

[12] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (Last Accessed November 18, 2022)

[13] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/ (Last Accessed November
18, 2022)

[14] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*,
Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (Last
Accessed November 18, 2022)

33.     PFAS chemicals have been associated with a variety of negative health effects for humans and the environment.

34.     The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:" [15]

   a. Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

   b. Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

   c. Increased risk of some cancers, including prostate, kidney, and testicular cancers.

   d. Reduced ability of the body's immune system to fight infections, including
   e. reduced vaccine response.

   f. Interference with the body's natural hormones.

   g. Increased cholesterol levels and/or risk of obesity.

35.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[16]

---

[15] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (Last Accessed November 18, 2022)

[16] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



36.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[17]

37.     The danger of PFAS chemicals is well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies",

---

[17] *Id.*

reported on the dangers of PFAS—particularly during gestation and in early childhood development:[18]

38.     Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.[19]

39.     PFAS in products which are consumed by children—such as the Product at issue here-- is particularly concerning, as children may be more sensitive to the harmful effects of chemicals such as PFAS.[20] Their immature organs and systems are more susceptible to damage, and children's ability to detoxify and eliminate toxics is variable.[21]

40.     Some of the reported health consequences of PFAS disproportionately affect children. Specifically, exposure to PFAS has been shown to affect growth, learning, and behavior in infants and older children.

41.     PFAS have also been shown to weaken children's immune systems during a critical period of development.[22] Specifically, there is strong evidence that exposure to PFAS in infancy and early childhood diminishes childhood antibody vaccination response, as well as some indication of increased risk of childhood infectious diseases.[23]

---

[18] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW YORK TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.
[19] *Id*.
[20] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (Last Accessed November 18, 2022)
[21] http://ncchild.org/wp-content/uploads/2020/02/1.22.20_PFAS-Impact-on-Children-Fact-sheet_Final-draft.pdf (Last Accessed November 18, 2022)
[22] https://www.mottchildren.org/posts/your-child/pfas-contamination; Stolber, T., "PFAS chemicals harm the immune system, decrease response to vaccines, new ewg review finds," Environmental Working Group, June 21, 2019. (Last Accessed November 18, 2022)
[23] https://www.sciencedirect.com/science/article/pii/S2405844021022635; von Holst, H. et. al., Perfluoroalkyl substances exposure and immunity, allergic response, infection, and asthma in children: review of epidemiologic studies. (Last Accessed November 18, 2022)

42.     In 2021, researchers found that early childhood exposure to PFAS in early life may disrupt neurodevelopment, with potential adverse impacts to children's behavior and executive function.[24]

43.     A study published in the International Journal of Environmental Research and Public Health found consistent evidence for PFAS' association with negative health outcomes in children, including dyslipidemia, renal dysfunction, and early onset of puberty.[25]

44.     It is increasingly understood that exposure to environmental chemicals during sensitive windows of development has the potential to permanently alter a child's risk of future adverse outcomes, even at doses that have little effect in adults.[26] According to children's environmental health experts, even "minuscule amounts of these exposures [to PFAS] can have serious and lifelong consequences [for children]."[27]

45.     According to the Environmental Protection Agency ("EPA"), limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[28]

---

[24] https://www.sciencedirect.com/science/article/pii/S0013935121009154; Harris, M. et. al., Prenatal and childhood exposure to per-and polyfluoroalkyl substances (PFAS) and child executive function and behavior problems. (Last Accessed November 18, 2022)
[25] *Id.*
[26] Rappazzo, Kristen M et al. "Exposure to Perfluorinated Alkyl Substances and Health Outcomes in Children: A Systematic Review of the Epidemiologic Literature." *International journal of environmental research and public health* vol. 14,7 691. 27 Jun. 2017, doi:10.3390/ijerph14070691 (Last Accessed November 18, 2022)
[27] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html (Last Accessed November 18, 2022)
[28] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (Last Accessed November 18, 2022)

46.     There is no treatment to remove PFAS from the body. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[29]

47.     Defendant is well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Product is free from artificial ingredients like PFAS.

48.     Defendant has engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Product is superior to other products that are not "all natural" or do not have the same purported health benefits.

49.     Reasonable consumers purchasing the Product would believe, based on Defendant's representations, that the Product does not contain artificial, synthetic or man-made chemicals that could adversely impact their health.

***Plaintiff's Independent Testing Confirms the Presence of PFAS Chemicals in the Product***

50.     Plaintiff sought independent third-party testing to determine whether the Product contained PFAS chemicals.

51.     Plaintiff's independent testing was conducted in accordance with accepted industry standards for detecting the presence of PFAS.

52.     Plaintiff's testing detected material levels of numerous PFAS in the Products, including concerning levels of Perfluorooctanoic acid ("PFOA").

53.     PFOA is one of the most well-studied types of PFAS, and it has been indisputably linked to negative health effects.[30]

---

[29] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure (Last Accessed November 18, 2022)
[30] https://www.atsdr.cdc.gov/pfas/health-effects/overview.html  (Last Accessed November 18, 2022)

14

54.     Human studies have found associations between PFOA exposure and effects on the immune system, the cardiovascular system, human development (e.g., decreased birth weight), and cancer. The most sensitive non-cancer effect and the basis for the updated health advisories for PFOA is suppression of vaccine response in children.[31]

55.     The EPA recently confirmed that the levels at which negative health effects could occur are much lower than previously understood– including <u>near zero</u> in some cases.[32]

56.     In other words, there is no "safe" level of exposure with regard to these chemicals, and even "trace" levels of PFAS can pose a risk to humans.

57.     The EPA recently tightened its lifetime health advisory levels for exposure to certain PFAS in drinking water. For PFOA, the recommendation is 0.004 part per trillion (ppt).[33]

58.     However, Plaintiff's testing has revealed the Product contains PFOA in amounts <u>more than 200 times the EPA's recommended levels</u>.

59.     Thus, Defendant's Product exposes hundreds of thousands of unsuspecting consumers, the majority of whom are children, to toxic synthetic chemicals at levels far beyond what the EPA deems safe, in direct contradiction to their uniform All Natural Representations.

***Defendant's Unlawful Conduct***

60.     Defendant represents to consumers that they take "food safety and quality very seriously, and [] will not compromise on it."[34]

---

[31] https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs#q3 (Last Accessed November 18, 2022)

[32] *Id*.

[33] *Id*.

[34] https://www.kraftheinzcompany.com/esg/food-safety.html (Last Accessed November 18, 2022)

61.     Defendant purports to have a comprehensive food safety and product quality management process across their global supply chain.[35]

62.     Accordingly, at all times relevant to this action, Defendant knew, or at minimum should have known, that its Product contains PFAS.

63.     To capitalize on increasing consumer demand for products free from artificial ingredients, including harmful man-made chemicals like PFAS, Defendant has knowingly and willfully deployed a concerted strategy to distinguish its Product from in the highly competitive kids' beverage industry by marketing Capri Sun to conscientious parents and caregivers, as well as consumers at large, as a kids' drink free from artificial ingredients.

64.     Consequently, reasonable consumers believe the Product is free of artificial, man-made chemicals known to harm human health.

65.     Defendant is well-aware that consumers are increasingly demanding beverage options that support their wellness goals. In their own words: "We aim to create innovations that satisfy consumer demand for new and health-conscious brands that they can feel good about. We do that by constantly researching, developing and launching products that reflect modern tastes, leading trends, and consumer preferences."[36]

66.     Defendant's wellness-focused business strategy is supported by current market research. According to a recent survey, chemicals in food (including carcinogens or cancer-causing chemicals) represents the most important food safety issue to consumers.[37]  Consumers

---

[35] *Id.*

[36] https://www.kraftheinzcompany.com/esg/nutrition-guidelines.html (Last Accessed November 18, 2022)

[37] Tom Neltner, "Chemicals in food continue to be a top food safety concern among consumers," (Sept. 16, 2021), https://blogs.edf.org/health/2021/09/16/chemicals-in-food-continue-to-be-a-topfood-safety-concern-among-consumers/ (Last Accessed November 18, 2022)

ranked this concern more highly than any other concern, including foodborne illness from bacteria and use of pesticides.[38]

67. At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices. One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[39]

68. These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[40]

69. Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[41]

70. Therefore, current research demonstrates, and Defendant's marketing strategy supports, that the presence of harmful chemicals in food, beverages, and their packaging is material to reasonable consumers.

71. Defendant's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell beverages which do not contain artificial ingredients, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Product.

---

[38] *Id.*
[39] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wpconent/uploads/2017/07/What-Shoppers-Want.pdf (Last Accessed November 18, 2022)
[40] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-thegame-for-food-beverage-processors/ (Last Accessed November 18, 2022)
[41] Made Safe, "What Shoppers Want," at 3.

72.     Based on Defendant's purported commitment to food safety and quality, including its internal quality management system, Defendant knew, or at minimum should have known, that the presence of PFAS posed a concern with regard to the safety of the Product. Despite this knowledge, Defendant failed to disclose the presence of PFAS in the Product. Such omission was material to consumers.

73.     Consumers lack the expertise to ascertain the true ingredients in the Product prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendant to accurately and honestly advertise its Product's ingredients as "All Natural," and not contradict those representations by using artificial man-made chemicals in its Product that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

74.     Defendant's representations that the Product is free of artificial ingredients, including *inter alia*, the All Natural Representations described herein, are false because products containing toxic, man-made ingredients like PFAS are not natural by definition.

75.     Defendant's representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiff and Class members, regarding the presence of PFAS chemicals in its Product. Accordingly, these acts and practices by Defendant are deceptive.

76.     Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's Product would conform with its representations and, as such, would not contain artificial, man-made PFAS chemicals.

77.     Defendant's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Product worthless or less valuable.

78.     If Defendant had disclosed to Plaintiff and putative Class Members that its Product contained PFAS chemicals, Plaintiff and putative Class Members would not have purchased the Product, or they would have paid less for it.

79.     Plaintiff and Class Members were among the intended recipients of Defendant's deceptive representations and omissions described herein.

80.     Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

81.     The materiality of the representations described herein also establishes causation between Defendant's conduct and the injuries Plaintiff and the Class Members sustained.

82.     Defendant is aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its Product using the "All Natural," health-focused representations in order to profit off of unsuspecting consumers, including Plaintiff and Class Members.

83.     The presence of PFAS chemicals in Defendant's Product is entirely inconsistent with its uniform representations.

84.     Defendant's knowingly false and misleading representations have the intended result of convincing reasonable consumers that its Product is without "chemical" or "artificial" ingredients and therefore do not contain artificial, man-made, toxic chemicals. No reasonable consumer would consider Defendant's Product as being an "All Natural," healthy juice drink if they knew that the Product contained harmful, artificial PFAS chemicals.

85. Defendant's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and Class Members.

86. In making the false, misleading, and deceptive representations, Defendant knew intended consumers would pay a premium for the Product over comparable products that are made from or contain synthetic or artificial ingredients.

87. Plaintiff and Class Members all paid money for the Product; however, they did not obtain the full value of the advertised Product due to Defendant's misrepresentations and material omissions as detailed herein. Plaintiff and Class Members purchased, purchased more of, or paid more for, the Product than they would have had they known the truth about the Product's artificial, man-made, and harmful ingredients. Thus, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

88. Defendant's widespread marketing campaign portraying the Product as containing "All Natural" and healthy ingredients as detailed herein, is misleading and deceptive to consumers because the Product is made with artificial, man-made, and toxic ingredients. Plaintiff brings this action on behalf of the proposed Classes to stop Defendant's misleading practices.

## **PLAINTIFF'S FACTUAL ALLEGATIONS**

89. Plaintiff Alexandra Toribio is a citizen and resident of the state of New York. During the applicable statute of limitations period, Plaintiff purchased and consumed Defendant's Product that contained PFAS. More specifically, during the class period, Plaintiff purchased Defendant's Product numerous times from various retailers including Stop & Shop locations in Nassau County, New York.

90.     Prior to her purchase, Plaintiff reviewed the labeling, packaging, and marketing materials of her Product, including those set out herein.  Thus, Plaintiff understood that based on Defendant's claims, the Product was safe for use and was a juice beverage containing "All Natural Ingredients" and thus was free of harmful, man-made chemicals like PFAS.  Plaintiff reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that she would not have purchased the Product or would not have purchased it on the same terms, if the true facts had been known.

91.     As a direct result of Defendant's material misrepresentations and omissions, Plaintiff suffered and continues to suffer, economic injuries.

92.     Plaintiff continues to desire to purchase the Product if she can rely on that Product to be safe and free from any artificial ingredients, including those known to pose a risk to human health.  However, concerned about the health consequences of PFAS and Defendant's misrepresentations detailed herein, Plaintiff is unable to determine if Defendant's Product is actually all natural and free of harmful chemicals like PFAS in the future.  Plaintiff understands that the composition of the Product may change over time, but as long as Defendant may freely advertise the Product as safe, natural, or healthy when it actually contains material levels of PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendant's Product and will be unable to evaluate the different prices between Defendant's Product and competitor's products, which *are* in fact all natural and free of PFAS.

**INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM**

93.     Defendant's wrongful conduct harms the public-at-large.

94. PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

95. PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

96. Because Defendant's deceptive advertising is ongoing and directed to the public, and because Defendant continues to sell its Product containing PFAS chemicals, the deception poses an ongoing risk to the public.

97. As such, a public injunction must be provided in order to enjoin Defendant's continued harm of consumers and the public-at-large.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

98. Defendant had actual knowledge that its Product contained artificial, man-made PFAS chemicals which pose a risk of harm to human health.

99. Although Defendant was aware of the deception in their advertising, marketing, packaging, and sale of the Product given the inclusion of PFAS chemicals, it took no steps to disclose to Plaintiff or Class Members that its Product contained PFAS chemicals.

100. Despite its knowledge, Defendant has fraudulently misrepresented the Product as having qualities and characteristics it does not, while concealing the fact that its Product contains PFAS chemicals.

101. Defendant made, and continue to make, affirmative false statements and misrepresentations to consumers, and continue to omit the fact that the Product contains PFAS, to promote sales of its Product.

102.    Defendant misrepresented, concealed, and otherwise omitted material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Product. Defendant's misrepresentations and omissions were knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members. Accordingly, Plaintiff and Class Members reasonably relied upon Defendant's misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

103.    The PFAS chemicals in the design and/or manufacture of Defendant's Product was not reasonably detectible to Plaintiff and Class Members.

104.    At all times, Defendant actively and intentionally misrepresented the qualities and characteristics of the Product, while concealing the existence of the PFAS chemicals and failing to inform Plaintiff or Class Members of the existence of the PFAS chemicals in its Product. Accordingly, Plaintiff's and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

105.    Defendant's statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Product contained artificial, man-made PFAS chemicals.

106.    Defendant misrepresented the Product and concealed the PFAS chemicals for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

107.    As a result of Defendant's intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiff and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from relying on any statutes of

limitations in light of its intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Product.

108.     Further, the causes of action alleged herein did not occur until Plaintiff and Class Members discovered that the Product contained PFAS chemicals. Plaintiff and Class Members had no realistic ability to discern that the Product contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence and true nature of the Product.

## FEDERAL RULE OF CIVIL PROCEDURE 9(b) ALLEGATIONS

109.     Although Defendant is in the best position to know what content it placed on its packaging, website(s), and other marketing and advertising during the relevant timeframe, and the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of PFAS chemicals in the Product to Plaintiff and consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

110.     **WHO**: Defendant made its "All Natural" and other health-focused representations on the Product's packaging, online, and its marketing and advertising of the Product.

111.     **WHAT**: Defendant's conduct here was, and continues to be, deceptive and fraudulent because of its "All Natural" and health-focused representations. Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Product was manufactured and sold with the represented qualities. Defendant knew or should have known this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet it continued to pervasively market the Product as possessing qualities they do not have.

112. **WHEN**: Defendant made material misrepresentations, false statements and/or material omissions during the putative Class periods and at the time Plaintiff and Class Members purchased the Product, prior to and at the time Plaintiff and Class Members made claims after realizing the Product contained artificial, man-made chemicals, and continuously throughout the applicable Class periods.

113. **WHERE**: Defendant's marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Product's packaging, as well as on the official website used to market and advertise the Product.

114. **HOW**: Defendant made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Product.

115. **WHY**: Defendant made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Product over other brands that did not make similar "All Natural" and health-focused representations, the effect of which was that Defendant profited by selling the Product to many thousands of consumers.

116. **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Product when they otherwise would not have, absent Defendant's misrepresentations, false and misleading statements.

## CLASS ACTION ALLEGATIONS

117. Plaintiff brings this action individually and as the representative of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

**National Class**: During the fullest period allowed by law, all persons who purchased the Product within the United States for personal use and not for resale.

**New York Subclass**: During the fullest period allowed by law, all persons who purchased the Product within the State of New York for personal use and not for resale.

118.    Members of the classes described are referred to herein as "Class Members" or members of the "Class."

119.    Plaintiff reserves the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded, or otherwise modified.

120.    The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

121.    **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiff does not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Product nationally, the members of the Class are so numerous that their individual joinder herein is impracticable.  Plaintiff is informed and believes that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the

disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

122.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

  a.    Whether Defendant misrepresented, omitted, and/or failed to disclose material facts concerning the Product;

  b.    Whether Defendant's' conduct was unlawful; unfair; fraudulent and/or deceptive;

  c.    Whether Defendant breached express warranties to Plaintiff and Class Members;

  d.    Whether Defendant was unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the proposed Class;

  e.    Whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiff seeks to enforce on behalf of herself and the other Members of the proposed Class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

123.     **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Class because, among other things, all Members of the Class were comparably injured through Defendant's uniform misconduct described herein. Further, there are no defenses available to Defendant that are unique to Plaintiff or to any particular Members of the Class.

124. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Members of the Class he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and he will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and the undersigned counsel.

125. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendant. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

126. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Members of the Class to individually seek redress for Defendant's wrongful conduct. Even if Members of the Class could afford individual litigation, the court system could not. Individualized litigation would create a

potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Violation Of Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq.***
**(On Behalf of Plaintiff and the National Class and Alternatively the New York Subclass)**

127. Plaintiff repeats and re-allege all previous paragraphs, as if fully included herein.

128. As previously alleged, this Court has original jurisdiction over this matter based upon the requirements of CAFA; therefore, the Court has alternate jurisdiction over Plaintiff's Magnuson-Moss claim.

129. The Product is a consumer product as defined in 15 U.S.C. § 2301(1).

130. Plaintiff and the National Class members are consumers as defined in 15 U.S.C. § 2301(3) and utilized the Product for personal and household use and not for resale or commercial purposes.

131. Plaintiff purchased the Product costing more than $5 and their individual claim is greater than $25 as required by 15 U.S.C. §§ 2302(e) and 2310(d)(3)(A).

132. Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

133. The federal Magnuson-Moss Warranty Act ("MMWA" or "Act"), 15 U.S.C. §§ 2301-2312, is a consumer protection regime designed to supplement state warranty law.

134. The MMWA provides a cause of action for breach of warranty, including the violation of express and implied warranty of merchantability, or other violations of the Act. 15 U.S.C. § 2310(d)(1).

135.    Defendant has breached the implied warranties of merchantability by failing to provide merchantable goods. The Product at issue is not merchantable or fit for its ordinary purposes because the Product contains ingredients that render the Product as not containing "all natural ingredients" by definition.

136.    Therefore, Defendant's Product is not merchantable or fit for its ordinary purposes because it does not contain "all natural ingredients" given it contains man-made and synthetic PFAS.

137.    Defendant violated the express warranty because despite claiming it contains "all natural ingredients", it does not contain all natural ingredients because it contains a non-trace amount of PFAS chemicals that renders the Product not all natural. Hence, it breached the express warranty by making said representation.

138.    In its capacity as warrantor, and by the conduct described herein, any attempt by Defendant to limit the warranties in a manner that it does is not permitted by law.

139.    By Defendant's conduct as described herein, Defendant has failed to comply with their obligations under their implied promises, warranties, and representations.

140.    Plaintiff and the National Class fulfilled their obligations under the implied warranties and express warranties for the Product.

141.    As a result of Defendant's breach of warranties, Plaintiff and the National Class are entitled to revoke their acceptance of the Product, obtain damages, punitive damages, equitable relief, and attorneys' fees and costs pursuant to 15 U.S.C. § 2301.

**COUNT II**
**Violation of the New York Deceptive Trade Practices Act,**
**New York Gen. Bus. Law § 349, *et seq.***
**(Plaintiff on behalf of the New York Subclass)**

142.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

143.    The New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

144.    Defendant misleadingly, inaccurately, and deceptively advertises and markets their Product to consumers.

145.    Defendant's improper consumer-oriented conduct—including labeling and advertising the Product as containing "all natural ingredients" —is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendant's Product and to use the Product when they otherwise would not have. Defendant made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

146.    Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for a Product that was—contrary to Defendant's representations— not natural and did contain dangerous levels of the man-made chemical PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

147.    Defendant's advertising and Product's packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Product and to pay a premium price.

148.    Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

149.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, compensatory,

treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

150.    In addition, Plaintiff and Class Members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

151.    Finally, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### COUNT III
### Violation of the New York Deceptive Trade Practice Act,
### New York Gen. Bus. Law § 350, *et seq.*
### (Plaintiff on behalf of the New York Subclass)

152.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

153.    The N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

154.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

155.    Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning Defendant's Product inasmuch as they misrepresent that the Product contains "all natural" ingredients and is free of PFAS.

156.    Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Product which

were—contrary to Defendant's representations—not natural and did contain dangerous levels of PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

157.    Defendant's advertising, packaging, and Product's labeling induced Plaintiff and the New York Subclass Members to buy Defendant's Product.

158.    Defendant made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

159.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

160.    Defendant made the material misrepresentations described in this Complaint in Defendant's advertising and on the Product's packaging and labeling.

161.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Product were and continue to be exposed to Defendant's material misrepresentations.

162.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

163.    In addition, Plaintiff and Class Members seek equitable and injunctive relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

164.    Finally, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT IV
## Breach of Express Warranty
## (Plaintiff on Behalf of the Class)

165.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

166.    At Plaintiff and Class Members formed a contract with Defendant at the time Plaintiff and Class Members purchased the Product.

167.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Product packaging and through marketing and advertising, as described above.

168.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and Class Members.

169.    As set forth above, Defendant purports through its advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for consumption and contains "all natural ingredients."

170.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

171.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiff's and Class Members' decision to purchase the Product.

172.    Plaintiff and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Product.

173.    Plaintiff and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

174.    Defendant thereby breached the following state warranty laws:

a.      Code of Ala. § 7-2-313;

b.      Alaska Stat. § 45.02.313;

c.      A.R.S. § 47-2313;

d.      A.C.A. § 4-2-313;

e.      Cal. Comm. Code § 2313;

f.      Colo. Rev. Stat. § 4-2-313;

g.      Conn. Gen. Stat. § 42a-2-313;

h.      6 Del. C. § 2-313;

i.      D.C. Code § 28:2-313;

j.      Fla. Stat. § 672.313;

k.      O.C.G.A. § 11-2-313;

l.      H.R.S. § 490:2-313;

m.      Idaho Code § 28-2-313;

n.      810 I.L.C.S. 5/2-313;

o.      Ind. Code § 26-1-2-313;

p.      Iowa Code § 554.2313;

q.      K.S.A. § 84-2-313;

r.      K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-313;

t.      Md. Commercial Law Code Ann. § 2-313;

u.      106 Mass. Gen. Laws Ann. § 2-313;

v.      M.C.L.S. § 440.2313;

w.      Minn. Stat. § 336.2-313;

x. Miss. Code Ann. § 75-2-313;

y. R.S. Mo. § 400.2-313;

z. Mont. Code Anno. § 30-2-313;

aa. Neb. Rev. Stat. § 2-313;

bb. Nev. Rev. Stat. Ann. § 104.2313;

cc. R.S.A. 382-A:2-313;

dd. N.J. Stat. Ann. § 12A:2-313;

ee. N.M. Stat. Ann. § 55-2-313;

ff. N.Y. U.C.C. Law § 2-313;

gg. N.C. Gen. Stat. § 25-2-313;

hh. N.D. Cent. Code § 41-02-30;

ii. II. O.R.C. Ann. § 1302.26;

jj. 12A Okl. St. § 2-313;

kk. Or. Rev. Stat. § 72-3130;

ll. 13 Pa. Rev. Stat. § 72-3130;

mm. R.I. Gen. Laws § 6A-2-313;

nn. S.C. Code Ann. § 36-2-313;

oo. S.D. Codified Laws, § 57A-2-313;

pp. Tenn. Code Ann. § 47-2-313;

qq. Tex. Bus. & Com. Code § 2.313;

rr. Utah Code Ann. § 70A-2-313;

ss. 9A V.S.A. § 2-313;

tt. Va. Code Ann. § 59.1-504.2;

uu.     Wash. Rev. Code Ann. § 6A.2-313;

vv.     W. Va. Code § 46-2-313;

ww.     Wis. Stat. § 402.313; and

xx.     Wyo. Stat. § 34.1-2-313.

175.    Within a reasonable time after it knew or should have known, Defendant did not change the Products' label to stop the deceptive acts and practices by falsely warranting that its Product was a juice drink made from all natural ingredients when in fact it was not natural, and by falsely omitting that its Product contained material levels of PFAS.

**COUNT V**
**Fraud**
**(Plaintiff On Behalf of the Class)**

176.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

177.    At the time Plaintiff and Class Members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as safe.

178.    Defendant affirmatively misrepresented the nature and quality of the Product, giving the Product the appearance of being all natural and safe for human consumption.

179.    Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

180.    Defendant possessed superior knowledge as Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

181.    Plaintiff and Class Members were reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

182.    Plaintiff and Class Members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained exclusive control over knowledge of the true quality of the Product.

183.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

184.    Additionally, as a result of Defendant's willful and malicious conduct, punitive damages are warranted.

<u>**COUNT VI**</u>
**Constructive Fraud**
**(Plaintiff On Behalf of the Class)**

185.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

186.    At the time Plaintiff and Class Members purchased the Product, Defendant falsely claimed the Product was "all natural" and did not disclose that the Product contains dangerous levels of PFAS.

187.    Defendant affirmatively misrepresented the nature of the Product, giving the Product the appearance of being natural, healthy, and otherwise safe for human consumption as detailed herein.

188.    Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

189.    Defendant had an obligation not to omit or misrepresent the Product because in addition to the fact that the Product pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Product; (c)

Plaintiff and the Class Members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

190.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature and quality of the Product.

191.    Plaintiff and Class Members were reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

192.    152. Plaintiff and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained exclusive control over knowledge of the true quality of the Product, and what information was available regarding the Product.

193.    Defendant breached their duty to Plaintiff and Class Members to make full disclosures of the safety of their Product.

194.    Plaintiff and Class Members sustained actual losses and damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, in a sum to be determined at trial.

<u>**COUNT VII**</u>
**Unjust Enrichment**
**(In the Alternative and on Behalf of the Class)**

195.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

196.    At all relevant times, Defendant was responsible for designing, formulating, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product and its packaging. At all relevant times, it was reasonably foreseeable by Defendant that

the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Product.

197.   At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

198.   Defendant as the designer, formulator, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiff and the Class of all dangers associated with consumption of the Product.

199.   At minimum, the duty arose for Defendant to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

200.   Defendant has been unjustly enriched in retaining the revenues derived from the purchases of the Product by Plaintiff and the other members of the Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendant's representations regarding the quality or value of the Product were misleading to consumers, which caused injuries to Plaintiff and the other members of the Class, because they would have not purchased the Product had they known the truth or would only have purchased the Product for a lower price.

201.   Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the other members of the Class for its unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated members of the Class, prays for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

(b) Directing that Defendant bear the costs of any notice sent to the Class;

(c) Ordering Defendant to pay restitution to Plaintiff and the Class;

(d) A jury trial and damages according to proof;

(e) Awarding actual damages to Plaintiff and the Class;

(f) Awarding Plaintiff and members of the Class statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(g) Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class;

(h) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(i) Ordering such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of the claims asserted in this Class Action Complaint.


Dated: November 29, 2022                                    Respectfully submitted,



                                     /s/ Gary Klinger
                                    Gary Klinger
                                    **MILBERG COLEMAN BRYSON**
                                    **PHILLIPS GROSSMAN, PLLC**
                                    221 West Monroe Street, Suite 2100
                                    Chicago, IL 60606
                                    Tel: (866) 252-0878
                                    gklinger@milberg.com

Nick Suciu III
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Road, Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
nsuciu@milberg.com

Erin Ruben*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

J. Hunter Bryson*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
405 E 50th Street
New York, NY 10022
Tel: (630) 796-0903
hbryson@milberg.com

Jason P. Sultzer, Esq.*
Daniel Markowitz, Esq.*
**THE SULTZER LAW GROUP P.C.**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

*Pro Hac Vice* application forthcoming

*Attorneys for Plaintiff and the Proposed
Class*